UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | NO. 3:21-CR-47 (JAM) |
| vs. | : | |
| | : | June 12, 2023 |
| RICHARD SMITH | | |

**<u>SENTENCING MEMORANDUM</u>**

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████ Given Mr. Smith's advanced age and poor health, a sentence of 10 years' imprisonment would resemble a sentence of life imprisonment and is sufficient to meet the purposes of sentencing.

Mr. Smith committed a very serious crime. He will be punished very severely. Mr. Smith is deeply remorseful for what he has done. Although he can never undo his actions, he has set his intention on understanding the constellation of factors that have led to his conduct and has taken steps even while incarcerated to begin the process of ensuring that he never re-offends.

In the light of Mr. Smith's history and characteristics, the nature and circumstances of his offense, and the need for a sense of proportionality even within the context of a very serious offense, the Court should impose a sentence of 10 years' incarceration and a period of supervised release with conditions requiring intensive individual mental health treatment.

I.      **The Personal Characteristics of Richard Smith**

Richard Edward Smith was born in 1956 in Waterbury, Connecticut. PSR ¶ 49. Mr. Smith

has no memories before the age of four.  Exh. A (May 22, 2023 Forensic-Psychiatric Evaluation of Richard Smith) at 3.  He described the period from ages four to 10 as his "stressed childhood."  *Ibid.*; *see also* PSR ¶¶ 50–51.

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

Mr. Smith's father was not active in his upbringing, "was rarely home" and "did everything he could to get out of the house."  PSR ¶ 50; *see also* Exh. A at 3.  Mr. Smith "hardly knew his father and they never became close, as his mother would not allow for it."  PSR ¶ 50.

As a child, Mr. Smith was only allowed to spend time with "three specific friends," and his mother set limitations as to which "activities he could engage in with those peers."  Exh. A at 3. *See also* PSR ¶ 51 ("Mr. Smith . . . was not allowed to participate in sleepovers, eat meals with his friends or attend his friends' birthday parties.").  Mr. Smith's mother had a "claustrophobic" grasp on his daily routine and did not allow him to participate in any extracurricular activities prior to the age of 14.  Exh. A at 3.  If Mr. Smith disobeyed his mother, "the few freedoms that he was afforded, including his participation in swim team and the Junior Naval Cadets were revoked."  *Ibid.*  Mr. Smith

"verbally fought with his mother daily."  PSR ¶ 51.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████  Mr. Smith's parents' absence from the important events in his life, from sports games to science fairs, also "started to weigh heavily on him during high school, eroding his self- esteem and fueling anger which he would discharge through verbal taunts."  *Id.* at 4; *see also* PSR ¶ 52.  In college, Mr. Smith continued to feel "socially isolated," did not enjoy his college experience, and ultimately dropped out.  Exh. A at 4; *see also* PSR ¶¶ 69–70; Exh. B at 3.

Unable to form meaningful relationships with people, Mr. Smith turned to computers. After completing a computer programming course in East Hartford, Mr. Smith obtained employment as a programmer at a consulting company.  PSR ¶¶ 67, 78; Exh. A at 4.  Mr. Smith experienced success at the company and went on to a successful career in information technology (IT), ultimately becoming the IT manager at the Yale School of Medicine.  PSR ¶ 78.

Despite his success at work, Mr. Smith's "isolation and loneliness continued to grow," and "he began feeling 'desperate' for human interaction."  Exh. A at 5.  ████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████

Mr. Smith met his wife in 1990 while he was working at the Yale School of Medicine and she was working at Yale New Haven Hospital.  *See* Exh. A at 5.  The two wed in 1993.  PSR ¶ 55.  In 1995,

Mr. Smith and his wife began participating in competitive dog shows.  Exh. A at 6; Exh. B; Exh. C (Apr. 18, 2023 Ltr from C. Smith to Court); PSR ¶ 65.  Mr. Smith eventually served on the board of directors for the Colonial Shiba Inu Club and the National Shiba Inu Club.  PSR ¶ 65.  The couple share many other hobbies, including gardening.  Exh. C.  Mr. Smith became obsessed with gardening, including building a raised garden with 144 beds, extensively researching seeds and plants, and compulsively cataloging and mapping each plant.  *Id.* at 2–3.  According to his sister, after entering middle age, Mr. Smith had "no interest in other people – his main interest was his champion dogs and his garden."  Exh. A at 11.

██████████████████████████████████

████████████████████████████████████████████

███████████████████████

███████████████████████ Mr. Smith obtained his associate degree in general studies from Naugatuck Valley Community College in Waterbury, Connecticut. *Ibid.*; PSR ¶ 66. He subsequently earned his bachelor's degree in industrial technology from Central Connecticut State University in New Britain, Connecticut. *Ibid.* Mr. Smith was employed from 2007 until 2013 as a grower and truck driver for Casterano Greenhouses and Farms in Cheshire, Connecticut. PSR ¶ 76; Exh. A at 7.

██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████







██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

Mr. Smith has not incurred any disciplinary infractions during the more than 33 months that he has spent in custody since October 1, 2020.  PSR ¶ 5.

## II.    The Guidelines

Mr. Smith pled guilty to one count of possession of child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5) & (b)(2).  *See* ECF No. 61.  Pursuant to the plea agreement, the parties stipulated to a Guidelines range of 135–168 months' imprisonment.  *Id.* at 7.  The U.S. Probation Office reached the same calculation.  PSR ¶ 84.

This Guidelines calculation relies on numerous enhancements which, prior to application of the three-point reduction for acceptance of responsibility, literally double Mr. Smith's offense level from 18 to 36.  *See* PSR ¶¶ 26–30.  Mr. Smith reserves his right to object to these enhancements. However, should the Court agree that a downward departure or variance to the mandatory-minimum sentence of 120 months' imprisonment would be appropriate in this case, any disagreement over these enhancements would be moot.

The Presentence Report noted that "[a]ccording to the JSIN, using Guideline § 2G2.2 and contemplating a Total Offense Level of 33 and Criminal History Category I, the average length of imprisonment imposed within the last five fiscal years was 91 months and the median length of imprisonment imposed was 96 months."  PSR ¶ 87.  Mr. Smith has a lower criminal history score than many defendants in criminal history category I, which also includes defendants with one criminal history point and much more recent convictions.  *See* PSR ¶ 44 (calculating Mr. Smith's criminal history score of zero).

As explained below, the defense respectfully requests a sentence of 120 months' imprisonment, 15 months (12.5%) below the bottom of the Guidelines range calculated by the U.S. Probation Office.

## III.    The Parsimony Clause

In determining an appropriate sentence, the sentencing court must apply the "parsimony clause" set forth in 18 U.S.C. § 3553(a), which provides that the court "shall impose a sentence sufficient, but not greater than necessary" to comply with the purposes of sentencing.  The Court of Appeals explained in *United States v. Ministro-Tapia*, 470 F.3d 137 (2d Cir. 2006), that if the Court believes a lower sentence will be as effective as a higher sentence in serving the purposes of sentencing, it must choose the lower sentence.  *See id.* at 142 (stating that where a Guidelines sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause requires imposition of the lower sentence).

While the Court is required to consider the range of penalties suggested by the Sentencing Guidelines in determining the appropriate sentence in a given case, that range does not bind the Court. *See United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005).  The Supreme Court has repeatedly reminded sentencing courts that "[t]he Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original); *see also Rita v. United States*, 551 U.S. 338, 351 (2007) (emphasizing that the only "presumption of reasonableness" that applies to a Guidelines sentence is "an *appellate* court presumption," not applicable in the initial sentencing analysis conducted by the District Court) (emphasis in original).  Thus, while the Court must consider the recommendations of the advisory Guidelines, the Court may not presume that those recommendations are reasonable.  Instead, the Court must treat the recommended Guidelines sentence as only one among numerous factors.

11

## IV.    Argument

Mr. Smith fully acknowledges that he committed the offense conduct.   He has been incarcerated for nearly three years and understands and accepts the possibility that he will die in prison.  *See* PSR ¶ 64 ("Mr. Smith advised that he has no future goals, as he expected to die while in custody for the instant offense. . . . [T]he males in his family have not lived pas[t] age 75.").

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████       ████████████████████████████████████████████

████████████████████████████████  Mr. Smith appreciates that if he lives long enough to complete his sentence, he would not be released until he is well into his 70s and would likely remain on supervised release for the remainder of his life.  Still, for this offense, and this defendant, 10 years in prison is punishment enough.

Mr. Smith seeks a downward departure or variance to a sentence of 120 months' imprisonment, including based on: ███████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████  (3) his low risk of recidivism, based on his advanced age and numerous other factors; and (4) because Guideline § 2G2.2 is "fundamentally different" and "can lead to unreasonable sentences" that are inconsistent with the mandates of 18 U.S.C. § 3553.  *See United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010).





14



**C.**    ***The Court Should Vary Downward Based Upon Mr. Smith's Uniquely Low Risk of Recidivism.***

The United States Sentencing Commission has reported that recidivism is extremely rare in cases like this.  According to Federal Sentencing of Child Pornography: Non-Production Offenses, a report prepared by the United States Sentencing Commission in 2021, the sexual recidivism rate for offenders charged with non-production child pornography offenses (such as Mr. Smith's) was only 4.3%.  Exh. A at 17.  Moreover, Dr. Bardey has evaluated Mr. Smith and concluded that he has a very low risk of sexual recidivism.  *Id.* at 16–17.

There are numerous other factors that greatly reduce Mr. Smith's risk of recidivism:  He is 67 years old.  He is college educated.  He has a robust history of employment.  He does not abuse alcohol or drugs.  He has only incurred three criminal convictions in his entire life, including this one, and his prior convictions are more than 20 years old.  ████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Due to the 10-year mandatory-minimum sentence applicable in this case, the Court should assess Mr. Smith's likely risk of recidivism after completing that mandatory sentence.  If he is still alive after a 10-year sentence, Mr. Smith will be that much older, weaker, and less likely to reoffend. For this reason, in combination with the other factors set out *supra* and *infra*, the sentence recommended by the Guidelines would be excessive in this case.

### D.      *The Court Should Vary Downward Based on* Dorvee*.*

"The instant offense requires the application of Guideline § 2G2.2.  Although the Court is required to calculate and consider the guidelines, in *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010), the Court of Appeals found Guideline § 2G2.2 to be 'fundamentally different,' and that, 'unless applied with great care, can lead to unreasonable sentences' that are inconsistent with the mandates of 18 U.S.C. § 3553.  This may be a mitigating factor for the Court to consider at sentencing."  PSR ¶ 107.

The Sentencing Guidelines applicable to child pornography offenses are astronomical.  While the Guidelines suggest a particular sentence in each case, their recommendation is just that – a suggestion.   Since the Supreme Court declared a mandatory sentencing guideline system unconstitutional, and effectively rendered the Guidelines advisory, in *United States v. Booker*, 543 U.S. 220 (2005), a sentencing court must *consider* the sentencing guidelines in determining the

appropriate sentence in a given case, but may not treat the Guidelines as binding.  *See Crosby*, 397 F.3d 103.

The strictly advisory nature of the Guidelines is particularly important in cases, like this one, involving possession of child pornography.  Sentencing courts are ordinarily expected to give a certain amount of deference to the judgment of the Sentencing Commission, because of its role as an expert agency.  As the Supreme Court has explained:

> Congress established the Commission to formulate and constantly refine national sentencing standards.  Carrying out its charge, the Commission fills an important institutional role:  It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.

*Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007).

However, in some cases, the Guidelines "do not exemplify the Commission's exercise of its characteristic institutional role."  *Id.* at 109.  In such cases, where the applicable Guidelines ranges are based on Congressional dictates and not on "empirical data and national experience," the Guidelines are not entitled to the same deference, particularly when the Commission itself has expressed concern that the Guidelines ranges are unreasonable.  *Id.* at 109.

That is precisely the case regarding the Guidelines for child pornography offenses, as the Second Circuit held in *United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010), and *United States v. Tutty*, 612 F.3d 128 (2d Cir. 2010).  *Dorvee* and *Tutty* addressed the Guidelines applicable to cases involving possession and distribution of child pornography under § 2G2.2, the Guideline applicable to this case.  The *Dorvee* Court explained that the child pornography guidelines are not based on Commission research of past sentencing practices; that the ranges have ballooned ever higher because of Congressional mandates in direct contravention of Commission recommendations; that various enhancements apply in the vast majority of all cases; and that, in sum, these guidelines, unless carefully considered and applied, will result in substantively unreasonable sentences in many cases.

17

The Second Circuit began in *Dorvee* by observing that child pornography cases involve "a Guideline that is fundamentally different from most and that, unless applied with great care, can lead to unreasonable sentences that are inconsistent with what § 3553 requires." *Dorvee*, 616 F.3d at 184. Other courts had previously reached a similar conclusion. *See, e.g., United States v. Riley*, 655 F. Supp. 2d 1298 (S.D. Fla. 2009); *United States v. Grober*, 595 F. Supp. 2d 382 (D.N.J. 2008); *United States v. Stern*, 590 F. Supp. 2d 945 (N.D. Ohio 2008); *United States v. Doktor*, 2008 WL 5334121 (M.D. Fla. Dec. 19, 2008); *United States v. Johnson*, 588 F. Supp. 2d 997 (S.D. Iowa 2008); *United States v. Noxon*, 2008 WL 4758583 (D. Kan. Oct. 28, 2008); *United States v. Shipley*, 560 F. Supp. 2d 739 (S.D. Iowa 2008); *United States v. Baird*, 580 F. Supp. 2d 889 (D. Neb. 2008); *United States v. Hanson*, 561 F. Supp. 2d 1004 (E.D. Wis. 2008).

The Guidelines provisions embodied in Section 2G2.2 were not developed using the Commission's usual empirical approach based on past experience. "Instead, at the direction of Congress, the Sentencing Commission has amended the Guidelines under § 2G2.2 several times since their introduction in 1987, each time recommending harsher penalties." *Dorvee*, 616 F.3d at 184. These amendments were enacted in a manner that "diverges significantly from the Sentencing Commission's typical empirical approach[.]"

The Third Circuit Court of Appeals has summarized the history of § 2G2.2, and concluded:

> As described in the Commission's 2009 Report, and as discussed by the Second Circuit in *Dorvee*, and, by now, numerous district courts, § 2G2.2 was not developed pursuant to the Commission's institutional role and based on empirical data and national experience, but instead was developed largely pursuant to congressional directives. As one district court put it, "the Commission probably did the best it could under difficult circumstances, but to say that the final product is the result of Commission data, study, and expertise simply ignores the facts." *Diaz*, 720 F. Supp. 2d 1039, 1045 (E.D. Wis. 2010).

*United States v. Grober*, 624 F.3d 592, 608 (3d Cir. 2010) (internal citations and footnote omitted).

18

### E.      The Section 3553 Factors Support a Sentence of 120 Months' Imprisonment.

1.      A sentence of 120 months' imprisonment achieves just punishment.

The offense of conviction, possession of child pornography, is a serious one.  However, as Dr. Bardey observed, "[t]here is no evidence . . . to suggest that Mr. Smith ever attempted to meet a minor in person or engage in sexual activity with a minor as part of the instant offense." Exh. A at 17. In other words, "Mr. Smith's offense conduct was not a conduit for any future attempts to engage in a contact offense with a minor." *Ibid.*  Mr. Smith's offense is also not as serious as distribution of child pornography offenses.

The government will fairly point out that Mr. Smith was convicted of two prior offenses, and that Mr. Smith should receive a significantly higher sentence for this offense than for his prior convictions.  And he will.  Notably, however, Mr. Smith's criminal history is already incorporated into and reflected by the 10-year mandatory-minimum term of imprisonment applicable in this case.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████

The Presentence Report suggests that Mr. Smith's criminal history category of I "appears to be understated." PSR ¶ 136.  The defense respectfully disagrees.  Mr. Smith's two prior convictions relate to offense conduct in 1990 and 1998, and Congress has appropriately decided, through the U.S. Sentencing Commission, that these decades-old convictions are too stale to warrant any criminal history points.  *See* PSR ¶¶ 42–43.  If anything, Mr. Smith's criminal history category *overstates* his criminal history because he has zero criminal history points and shares criminal history category I with defendants with one criminal history point (and much more recent convictions).  It has been nearly a quarter-century since Mr. Smith has last incurred a criminal conviction, and given his

advanced age and the mandatory-minimum term of imprisonment in this case, he will almost certainly not incur another one before he dies.

Mr. Smith has already been and will continue to be punished severely for this offense. If sentenced to the mandatory-minimum term of imprisonment, he will likely die in prison.  Mr. Smith was incarcerated for less than 13 months for his first offense and for approximately 36 months for his second offense.  *See* PSR ¶¶ 48–49.  Therefore, even after accounting for good conduct time, application of the mandatory-minimum term of imprisonment in this case would result in Mr. Smith being incarcerated for approximately ***three times*** as long as any prior period of incarceration. A Guidelines sentence, which would up to ***four times*** as long as Mr. Smith's longest prior period of incarceration, would not be proportionate, including because the instant conviction reflects a pattern of deescalating conduct.

Mr. Smith has also been penalized especially harshly because he has been incarcerated for this offense during the COVID-19 pandemic, from October 2020 until the present.  As the Court has recognized in considering reduction-in-sentence motions under Section 603 of the First Step Act, defendants incarcerated during the pandemic have had "minimal" contact with loved ones in the community "because of extended lockdowns, extremely short phone calls and the inability to have in-person visits, all of which were steps taken by the prison to manage risks associated with the pandemic."  *United States v. Morales*, No. 3:15-CR-168 (AWT), 2021 WL 567819, at *2 (D. Conn. Feb. 16, 2021) (Thompson, J.).

> 2. <u>A sentence longer than 120 months' imprisonment is not required to achieve deterrence or protect the public.</u>

A sentence longer than 120 months' imprisonment is not necessary to accomplish specific or general deterrence.  As to specific deterrence, according to available social science data, "the available evidence points toward a null or a slightly criminogenic effect of imprisonment but has rarely found

support for a clear specific deterrent effect." Ellen Raaijmakers, *et al.*, *Exploring the Relationship Between Subjectively Experienced Severity of Imprisonment and Recidivism: A Neglected Element in Testing Deterrence Theory*, 54 J. Res. Crime & Delinquency 1, 4 (2017). There is certainly no empirical evidence to suggest a period of imprisonment longer than 120 months is a necessary deterrent. Indeed, "[t]o our knowledge, there is no rigorous empirical study of whether, among second-time felons, tougher types of sanctions than what the individuals previously received results in the specific deterrent effect anticipated under contemporary sentencing schemes. Put differently, little evidence exists that a 'recidivist sentencing premium' (Roberts 2008:468) reduces recidivism." Daniel Mears & Joshua Cochran, *Progressively Tougher Sanctioning and Recidivism: Assessing the Effects of Different Types of Sanctions*, 54 J. Res. Crime & Delinquency 24 (2017).

A lengthy period of imprisonment is not only unnecessary to achieve the goals of deterrence and protecting society, but would be counterproductive insofar as long periods of incarceration have been shown to increase the criminogenic effects of imprisonment, including contact with more serious offenders and weakening of family ties. Francis T. Cullen, *et al.*, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. Supplement 485 (2011); U.S. Sentencing Commission, Staff Discussion Paper, Sentencing Options Under the Guidelines at 18–19 (Nov. 1996)

As for general deterrence, it is the fact of Mr. Smith's punishment and not its magnitude that matters. Each additional year that Mr. Smith spends incarcerated is not likely to provide any appreciable marginal increase in deterrence. As a 2012 review of the studies that have examined the deterrent effect of sentence severity concludes, "the vast majority of these comprehensive summaries found no convincing evidence suggesting that harsher sentences deter." Cheryl Marie Webster, *et al.*, *Searching for Sasquatch: Deterrence of Crime Through Sentence Severity*, *in* The Oxford Handbook on Sentencing and Corrections 173–195, 176 (2012). Recognizing that "effective

deterrence arises from certainty, not harshness, of punishment," a decision in the Eastern District of New York sensibly asks whether "our society might better consider whether our scarce resources would be better spent, not on extended incarceration, but on . . . non-incarceratory techniques." *United States v. Bannister*, 786 F. Supp. 2d 617, 668 (E.D.N.Y. 2011) (Weinstein, J.).

> Finally, as stated aptly by Danielle Sered in her groundbreaking book, *Until We Reckon*:

>> Deterrence theory assumes the existence of a set of circumstances that do not exist. To begin with, it assumes a level of civic knowledge and awareness—that everybody knows what the consequences are for a given crime. Increasing the length of sentences does not work to motivate change if no one knows that those sentences have changed. As a culture, we simply do not possess that level of knowledge or awareness. Nor do people typically learn about their peers' or neighbors' sentences with enough context to anticipate the consequences of their own actions.

DANIELLE SERED, UNTIL WE RECKON 61 (2019).

> 3.     A sentence of 120 months' imprisonment is sufficient to promote respect for the law.

A 10-year sentence is sufficient to promote respect for the law. "A society that sets an example of naked, pitiless vengeance will not promote respect for the law or compliance with the law's dictates." *United States v. Mattox*, 417 F. Supp. 343, 345 (S.D.N.Y. 1976). As the *Mattox* court went on to explain, "[t]he line between sternness and cruelty cannot be seen with mathematical precision. It must be espied by whatever light we can find. When the balance is uncertain, our law, like our professed morality, tells us to err on the side of mercy." *Ibid.*

> 4.     The goal of rehabilitation favors more treatment and less prison time.

The last statutory factor, the goal of rehabilitation, can be met with a below-Guidelines sentence. U.S.S.G. § 3553(a)(2)(D) requires the Court to consider "the need for the sentence imposed . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." This purpose militates strongly against a sentence longer than 120 months. Congress has explicitly directed that "imprisonment is not an

appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a). In this case, the goal of rehabilitation is better served by treatment than prison. During his presentence interview, Mr. Smith "expressed a desire to continue receiving mental health treatment during his term of incarceration." PSR ¶ 139. As noted by Dr. Bardey, Mr. Smith's "ability and willingness to introspect bode well for his future trajectory in treatment." Exh. A at 18.

## V.      Conclusion

A decade in prison is a long time. And for a 67-year-old man with serious health issues, it is tantamount to a life sentence. For the reasons discussed in this memorandum, in addition to any others deemed appropriate by the Court, Mr. Smith respectfully requests that the Court impose a sentence of 120 months' imprisonment, reflecting a modest departure or variance below the Guidelines.

Respectfully Submitted,

THE DEFENDANT,
Richard Smith

OFFICE OF THE FEDERAL DEFENDER

Date:  June 12, 2023

*/s/ Tracy Hayes*
Tracy Hayes
Assistant Federal Defender
265 Church Street, Suite 702
New Haven, CT 06510
Phone: (203) 498-4200
Bar No.: phv06527
Email: tracy_hayes@fd.org

*/s/ Andrew Giering*
Andrew Giering
Assistant Federal Defender
10 Columbus Blvd, Floor 6
Hartford, CT 06106
Phone: (860) 493-6260
Bar No.: ct29332
Email: andrew_giering@fd.org

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on June 12, 2023, a copy of the foregoing Sentencing Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Tracy Hayes*
Tracy Hayes